Leon **SMOTHERMAN**, Petitioner,

v.

**Dr. George J. BETO**, Director, Texas Department of Corrections, Respondent.

Civ. A. No. 3–1751.

United States District Court
N. D. Texas,
Dallas Division.

Nov. 24, 1967.

------◆------

Richard A. Moore, of Coke & Coke, Dallas, Tex., for petitioner.

Crawford C. Martin, Atty. Gen. of Texas, Ronald Luna, Asst. Atty. Gen. of Texas, Austin, Tex., for respondent.

## OPINION

WILLIAM M. TAYLOR, District Judge.

Leon Smotherman was convicted of statutory rape in the Criminal District Court of Dallas County, Texas, in April, 1961. A jury assessed his punishment at 99 years confinement in the Texas penitentiary. His conviction was not appealed. In 1966, Smotherman filed in federal court an application for a writ of habeas corpus, 28 U.S.C.A. § 2241, alleging that a confession given by him and introduced against him at his trial was not the product of his free will and that counsel appointed to defend him by the state court rendered him inadequate representation. A corollary issue of this latter contention is that Smotherman was denied the right to appeal his conviction due to the inept professional conduct of court-appointed counsel.

An evidentiary hearing was held to test the validity of the constitutional encroachments alleged by Smotherman. The Court is of the determination that the writ of habeas corpus must be granted.

This court does not have the benefit of the record of the trial in state court because the court reporter's notes were destroyed long prior to this hearing.

On September 27, 1960, the 11 year old prosecutrix revealed to her parents that she had engaged in sexual intercourse with Smotherman on the previous day. The girl's mother contacted the police and, on October 7, a warrant was issued for petitioner's arrest in Dallas County, Texas.

Petitioner was arrested by the Dallas police at approximately 2:00 A.M. on the morning of October 12, 1960. Around 3:30 A.M. he was transferred to the Mesquite, Texas jail where he was confined incommunicado for the following 5 days. On each of those 5 days petitioner was transported from the jail to a Texas Ranger station where he was interrogated concerning the rape. The ranger captain conducting the investigation talked to the young complainant prior to questioning petitioner and obtained the pertinent facts from her. During the several interrogations, the ranger had before him the girl's signed statement, which he used as a "guideline" in questioning petitioner, in which the girl stated not only that she had engaged in sexual intercourse with Smotherman on the night of September 26, 1960, but that she had also engaged in natural and unnatural sex relations with him since March or April of 1960. It is interesting to note that Smotherman's first confession on October 12, 1960 did not admit to the September 26 incident, but did admit to the misconduct during March of that year. His second confession, dated October 13, did admit to the September 26 affair, being the crime with which he was charged. The third confession bearing a date of October 16, not only admitted the September 26 offense, but gave additional details concerning surrounding circumstances which served to corroborate other matters contained in the girl's statement. It was not until this last confession that the ranger felt he "had all the facts" he "could get" from petitioner. Following this latter confession, which the ranger testified "pretty well corroborated the girl's statement", Smotherman was released on bond.

Smotherman testified that he did not sleep the night of his arrest. He was placed in a solitary confinement "hole" in the jail. At 5:30 A.M., he was given a hard boiled egg and a donut. Petitioner was removed from the "hole" when the Mesquite police became cognizant of the fact that he had emphysema and asthma. He testified that he asked the police to get his medicine out of his car which he was required to take for his asthma, but they never did so. He was not permitted to shower or shave that morning.

Around 9:00 A.M., Smotherman was taken to a Texas Ranger station. He was placed in a very small room which he thought was a closet for about 15 minutes. He was taken from the room to the office of Texas Ranger Captain Badgett where he was questioned for about 1½ hours. He was returned to the Mesquite jail around 11:00 A.M.

Smotherman stated he did not sleep much that night and was aroused the following day around 5:00 A.M., and given a donut. Again, he was not permitted to shower or shave and was taken back to the ranger station where he was questioned for 1½ hours. He was thereafter returned to the Mesquite jail where he was fed a hamburger and a cup of coffee for lunch. He was given no supper.

On October 14, he made the by then customary sojourn to the ranger station. While there he was fed a hamburger and a cup of coffee for lunch. He was returned to the Mesquite jail where he received no dinner.

On Saturday, October 15, petitioner was again taken to the ranger station for interrogation. He was given no breakfast or lunch, but had dinner that night at the Garland, Texas jail where he spent the night for reasons unknown to him.

October 16 was again spent at the ranger station. Petitioner received no

meals on that day. It was on this day, Smotherman testified, that he signed the confessions.

On October 17, petitioner was transported to the Dallas County jail and was released on bond.

Smotherman testified that during the 5 days he was held by the Mesquite police he was not permitted to use the telephone to make any calls. He got word to his sister and brother-in-law that he was in jail by way of a Mesquite jail prisoner who was released on October 14 or 15. He was not, during that time, taken before a magistrate and warned of his rights.[1]

The cell in which petitioner was incarcerated had a steel "bed" for him to sleep on. He offered to pay for toiletries, but was never allowed to shave or shower.

As to Friday of the week of interrogation, Smotherman's testimony was that he was hit in the ribs by a ranger named "Lynch", who was present while the ranger captain was questioning him. Lynch pulled his hair and called him abusive and obscene names. He testified he signed the confessions because he had been in custody of the police for a long period of time, had received no medicine for his asthmatic condition, and was physically weak.

The ranger's testimony contradicted petitioner's in most material respects. He related that Smotherman expressed a desire to make a statement the first time he questioned him on October 12, 1960. As evidence of petitioner's willingness to talk, the statement signed by him and dated October 12 was admitted into evidence. As a preface to taking this statement, as well as the second and third which petitioner made, the ranger warned him that anything he said could be used against him and that he had a right to have a lawyer "anytime he wanted."[2] Following this warning, how-

---

1. Article 247, Texas Code of Criminal Procedure, 1925. Superseded by Article 15.17, Code of Criminal Procedure, 1965.

2. This admonition was given petitioner more than 2 years before Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, was decided and al-

ever, petitioner never requested a lawyer. Nor did Smotherman ever request to use a telephone to contact friends or family.

The ranger was sure that petitioner was fed a noon meal each day he was at the ranger station. He stated that there was, in 1960, a ranger named Lynch stationed in Mineral Wells, Texas, but he "did not know that he was in on this investigation."

According to the ranger, it was necessary to take 3 confessions from petitioner because he kept "changing his story" and the ranger wanted to have one statement in its entirety rather than having to make additions to the original one.[3]

A detective of the Mesquite Police Department testified that petitioner was fed every day, that he never requested to use a telephone and that he never requested the police to secure his medicine for him.

Smotherman was released from the Dallas County jail on October 17, 1960. The lawyer who obtained his release worked on the case until petitioner's money could no longer purchase his services. Just when this lawyer ceased to represent petitioner was not made clear at the hearing. In any event, the state court appointed petitioner an attorney to represent him a week before the trial began on April 12, 1961.

Appointed counsel received his law degree in May, 1960.[4] He engaged in the private practice of law until May, 1961, at which time he went to work for an insurance company.

Testifying at the evidentiary hearing, court-appointed counsel expressed that following his assignment to petitioner's case he requested a postponement. The case went to trial one week thereafter.[5] Counsel recalled discussing petitioner's case with him at least one time and possibly another. Smotherman related that he talked to the lawyer only once and for such a brief period of time that he was unable to fully discuss the case with him.

It was the lawyer's testimony that Smotherman never communicated to him that the confession he gave the ranger was obtained by duress and coercive measures. The lawyer did not examine the confessions before trial. He made no effort to examine the arrest warrant nor did he scrutinize the police records relating to petitioner's arrest and confinement. He was unaware of the length of time Smotherman spent in jail subsequent to the arrest and that he had been extensively interrogated.

For reasons not disclosed at the evidentiary hearing, petitioner's defense at the trial was insanity. Petitioner testified he gave the attorney names of five persons who could testify on his behalf,[6] but after talking to these individuals the lawyer told him "they were no good for him." The attorney did not recall Smotherman giving him specific names of prospective witnesses. He did, however, interview some persons whom he was

---

most 4 years prior to Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. The ranger gave such a warning because the right to counsel "naturally would come into discussion of presentation of the evidence."

3. A reading of petitioner's confessions reveals that he made no "changes in his story." The second confession tracked the first, verbatim, and then added incriminating admissions. The third confession bears the same relation to the second; an identical reproduction with additional inculpatory statements by petitioner.

4. The Texas Bar Examination is given in June of each year and the results are not made public until early September, at which time those passing the examination are licensed to practice law.

5. It is not clear whether counsel was appointed on the day set for trial and obtained a week's postponement or whether he was appointed a week before trial and his request for postponement was denied.

6. The time at which the defense of insanity was decided upon is not established, hence it is unknown whether these witnesses were deemed of value by petitioner in presenting that defense or for some other purpose or defense.

led to believe were family or friends of the prosecutrix and did not, therefore, summon them to testify on behalf of petitioner.

At the trial the confession was identified and the predicate for its admission laid by the ranger. No objection was made by petitioner's counsel to its introduction nor were any questions asked of the ranger relative thereto. Counsel's reason for not questioning the confession seems to be based on the fact that the defense was insanity and this apparently meant that the defense did not dispute that the act charged did take place, but only challenged petitioner's legal responsibility for its commission.

 In support of the insanity defense, counsel called no witnesses, save petitioner himself. No medical evaluation of Smotherman was undertaken; he was the sole witness to his own mental incompetency.[7]

The trial lasted one day. Counsel received compensation from the State of Texas in the sum of $25 for the service he rendered petitioner.

Smotherman testified that 2 or 3 days following the sentencing and during his temporary confinement in the Dallas County jail, his lawyer came to the jail to see another client. It was at this time petitioner asked counsel to appeal his case because he thought he could get a lighter sentence at another trial, having not been in any prior trouble with the law. The lawyer replied that he did not have time to appeal the case then, but would do so later.

The attorney denied ever telling petitioner he did not have time to appeal his case and further that he never saw him after sentencing. He related that petitioner did not express dissatisfaction with his service.

Considering first petitioner's contention that his lawyer deprived him of an appeal, he testified he was advised by the trial judge at his sentencing that he had an "absolute right to an appeal." Counsel related that he did not recall talking to petitioner after the sentencing. Smotherman and his lawyer did not discuss appealing the case at the time of sentencing. Had petitioner expressed a desire at that time to appeal, counsel testified he would have given notice of appeal at the sentencing proceeding. Nonetheless, it appears from counsel's testimony that at no time did he discuss appealing the case with petitioner. At all times subsequent to the sentencing, petitioner was incarcerated. There is thus presented the case where a convicted defendant, who was represented by court-appointed counsel, knew of his right to appeal, desired to pursue that appeal, but the state records reflect that no such appeal was taken.

 In Douglas v. People of State of California, 1963, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811, the Supreme Court found condemnable state practices whereby,

the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself. 372 U.S. at 358, 83 S.Ct. at 816, 9 L.Ed.2d at 815.

The responsibility of court-appointed counsel does not stop when his client is found guilty or when sentence is pronounced. When the back of counsel's guiding hand is slapped by a 99 year jury verdict, it cannot so readily withdraw from its obligation as the testimony of petitioner's attorney indicates was done in this case. If the right to counsel is to have substance, it must extend to the defendant at the one stage of the criminal

7. In Texas a defendant interposing insanity as a defense must establish that at the time of the commission of the act he did not know the difference between right and wrong and that he did not know the nature and quality of the act. Article 34, Texas Penal Code, 1925. The defendant's burden in this proof is a preponderance of the evidence. Article 34, Texas Penal Code, 1925.

proceedings when he is least capable of standing on his own. The "preliminary determination that his case is without merit", as rendered by a jury imposing a 99 year sentence, is an onerous handicap on the defendant's ability to perceive not only that he is entitled to appellate redress, but moreover that any merit exists therein. When the state chooses to provide representation for an indigent defendant it must assure that the right to counsel remains inviolate from the beginning of the trial up to and including the appellate review, or in the absence of an appeal, to such time as the defendant intelligently waives an appeal. To this end, court-appointed counsel must advise the defendant not only that he has a right to appeal, but he must be admonished of any time limitations on the right to appellate review which the state has imposed. Fox v. State of North Carolina, E.D.N.C.1967, 266 F.Supp. 19. Counsel must further apprise the defendant of his right to counsel on appeal, his right to a copy of the transcript of the state court proceedings, and that the state will provide him with both counsel and transcript if he is unable to afford the costs thereof. Cf., Wynn v. Page, 10 Cir. 1966, 369 F.2d 930. As the court in this latter case observed,

> [Petitioner] also testified that he knew he had a right to appeal but he didn't know how. It appears that appellant's attorney was of the opinion that no reversible error occurred during the trial and there was no discussion after the trial between counsel and appellant concerning appeal. Well aware that the Federal courts should proceed with caution and with due respect for state processes, we believe we cannot disregard the apparent fact that appellant's fundamental right to assistance of counsel concerning his right to appeal was not adequately safeguarded. 369 F.2d at 932–933.

Merely because the court-appointed counsel who tried the case might be of the opinion that no reversible error occurred is no cause for failing to give the foregoing recitation of rights to the defendant.

The decision as to whether or not to appeal a conviction is, of course, that of the indigent defendant. He is no less a client than the defendant who has the funds to retain\counsel. Therefore, a waiver of the right to appeal cannot intelligently be made in the absence of counsel's examining the trial proceedings and, if necessary, researching the law for possible errors and thereafter admonishing the defendant of the possibilities for relief, or lack thereof, which an appeal would afford him. This is not requiring too much of trial counsel. He defended the case. If anyone is cognizant of the merit in an appeal, it is he. The right to an appeal as accorded defendants in Texas, and the right to appellate counsel, Douglas v. People of State of California, supra, would be very hollow things indeed, if a defendant were deprived of the right of counsel to guide him in an intelligent and knowing determination of whether to waive these rights.

Accordingly, when the state undertakes to represent indigents, it must assure that following a conviction court-appointed counsel fully advise the defendant of his appellate rights and provide the defendant with counseling as to any merit which an appeal may have. Should the defendant express a desire to pursue an appeal, counsel must bring such fact to the attention of the court and must take any steps which at that time are necessary to perfect an appeal under state law.

Failure of court-appointed counsel to take the foregoing steps results in a denial of the right to effective assistance of counsel, Fox v. State of North Carolina, supra, and a denial of the right to appeal under color of state action. Cf., MacKenna v. Ellis, 5 Cir., 1960, 280 F.2d 592; Anders v. State of California, 1967, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493.

Turning to Smotherman's contention that his attorney's representation was ineffective at the trial, determination thereof begins with Judge Coleman's ex-

pression in Williams v. Beto, 5 Cir., 1965, 354 F.2d 698, 706, that

> Court appointed counsel is no different to any other lawyer. He is still a lawyer, he is still practicing law, and he is no less confronted by difficult decisions of tactics and strategy. He cannot stand still and do nothing. That indeed might be the best evidence of incompetency, or infidelity, or ineffectiveness, or all three.

Adequate representation in a criminal proceeding is the cumulative act of affording the defendant an adequate defense. Defense attorneys are called upon to apply their knowledge, experience and talents to a given set of facts and to derive from such fusion a defense which the Sixth Amendment requires to be adequate, not miraculous. When the adequacy of a defense rendered by an attorney is subjected to attack, the relevant consideration is not whether the case was lost where it could have been won, but whether counsel "stood still and did nothing", Williams v. Beto, supra, to the extent that his representation failed to render *reasonably effective* assistance to the accused. MacKenna v. Ellis, 5 Cir., 1960, 280 F.2d 592, 599. When appearance of Counsel takes on the cloak of pro forma rather than that of zeal and action, the defendant has not had his day in court. Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158.

■ Smotherman was tried for a capital offense.[8] Such a case requires that every effort be exerted by the court in scrutinizing counsel's conduct. Powell v. State of Alabama, supra. While this court is hesitant to substitute its judgment for that of counsel who tried the case, in terms of what alternatives were open to and could have been pursued by counsel, the nature of this case requires an appraisal of those alternatives. Brooks v. State of Texas, 5 Cir., 1967,

381 F.2d 621, Roberts v. Dutton, 5 Cir., 1966, 368 F.2d 465.

■ Petitioner's insanity defense at his trial required proof by a preponderance of the evidence that he was of such mental condition on September 26, 1960 that he did not know the difference between right and wrong and the nature and consequences of his acts.[9] While the Texas rules of evidence permit a non-expert to testify on the issue of criminal insanity,[10] only the most naive would contend that such an opinion is not most properly the province of the medical expert. Yet no medical evaluation of petitioner was undertaken in his defense, and consequently, no medical evidence was offered at the trial. Neither was non-expert testimony brought forward on petitioner's behalf. Smotherman's own testimony was the sole source from which counsel sought to sustain the defense burden.

Why the insanity defense was chosen by defense counsel is not a matter of this court's knowledge. Indeed, the evidentiary hearing failed to establish any basis whatsoever upon which such a defense could have been reasonably predicated. Counsel and petitioner had but one brief meeting together before the case was tried. Only one week elapsed between the lawyer's appointment and the trial of the case. It cannot be contended that under these conditions counsel's representation was calculated to be reasonably effective. The presentation of the insanity defense itself, with petitioner as the only witness, is indicative of a defensive theory ill-supported by evidence and preparation.

Counsel never questioned the legality of petitioner's confession when it was read to the jury. His reason for this line of inaction was grounded on the fact that the defense was insanity. It is, of course, one thing for a lawyer to cal-

---

8. A capital offense in Texas is any crime for which the death penalty may be assessed. Martinez v. State, 1958, 167 Tex.Cr.R. 97, 318 S.W.2d 66. Statutory rape is punishable by death. Article 1189, Texas Penal Code, 1925.

9. See n. 7, supra.

10. Article 35, Texas Penal Code, 1925.

culate his defensive strategy and quite another to be unaware of the facts of the case. It is of serious concern to this case that counsel offered an inept defense of petitioner when he had access to a potent offense.

■ A conviction for statutory rape in Texas may be had on the uncorroborated testimony of a prosecutrix under the age of 15, Raifsnider v. State (1944), 146 Tex.Cr.R. 578, 176 S.W.2d 952; Blackmon v. State (1920), 87 Tex.Cr.App. 173, 220 S.W. 93. But such a case is one "* * * requiring special scrutiny by the jury and a careful weighing of the evidence, with all remote and near circumstances and probabilities", Blumenthal v. State (1928), 98 Tex.Cr.R. 601, 267 S.W. 727, 731, and when her testimony is self contradictory, Blair v. State (Tex.Crim.App.1900), 56 S.W. 622, or incredible, Donoghue v. State (Tex.Crim. App.1904), 79 S.W. 309, the conviction cannot stand in the absence of corroboration. The ranger captain was well aware that little evidence existed to corroborate the prosecutrix's story and to this end he interrogated petitioner until his final confession "pretty well corroborated" the girl's statement. Had court-appointed counsel assailed the voluntariness of the confession and succeeded in obtaining its exclusion,[11] the testimony of the 11 year old prosecutrix would have stood substantially uncorroborated.

The statement of the prosecutrix [12] admits that she had engaged in numerous acts of natural and unnatural sexual indulgence with petitioner prior to September 26, 1960. Smotherman's confession of October 16 reflects that he began having relations with the prosecutrix in March, 1960. There was here a fertile field for development of the relationship of the parties in an effort to mitigate punishment.

This 11 year old girl had a mother who was acquainted with Smotherman and on occasions was in company with both Smotherman and her daughter. The girl lived with her father occasionally and most of the time with a girl friend. Petitioner was not with the girl an excessive amount of time from March 1960 until September of that year; he saw her only occasionally on his visits to Dallas from his home in Tyler. Hence he was not in an advantageous position to physically exert dominion over the girl and prohibit her from making an outcry as to the defamation of her chastity, if in fact she was chaste when petitioner first met her. Nonetheless she apparently never mentioned her affair with Smotherman to anyone who would bring such fact to the attention of the police until September 27, the day following her all night affair with petitioner. There is no indication as to why she finally made an outcry on September 27.

■ To be sure, it is no defense to statutory rape of a female under 15 years of age that she was not chaste when the offense occurred. Tindol v. State (1951), 156 Tex.Cr.R. 187, 239 S.W.2d 396. However, prior acts of intercourse between the prosecutrix and the defendant are admissible, Hamilton v. State (1896), 36 Tex.Cr.R. 372, 37 S.W. 431, and such evidence bears directly on the issue of punishment which, under the Texas law in 1960, was set by the jury at the same time they determined the defendant's guilt or innocence.[13]

Even had counsel been unsuccessful in vitiating the confession in the state court, a full airing of all the facts of this case with concentration on the facts and cir-

11. While this court entertains substantial doubt as to the voluntariness of petitioner's last confession which was introduced in evidence, no attempt is made herein to pass thereon. As there has been no state court determination of this question, this court, is obliged to abstain from deciding the issue. Black v. Beto, 5 Cir. (1967) 382 F.2d 758.

12. The prosecutrix's statement from which the ranger questioned petitioner was made a part of this record by the pleadings.

13. Article 693, Texas Code of Criminal Procedure, 1925.

cumstances leading up and surrounding the offense, along with her admitted prior conduct with the petitioner, followed by a plea for mitigation of punishment, could well have provided petitioner a line of defense whereby reasonably effective representation could have been afforded him by counsel.

This court is necessarily loathe to hold ineffective the actions of an attorney simply because he did not pursue a better course of action than the one he did. Nonetheless, "[i]t is not enough to assume that counsel * * * exercised their best judgment in proceeding to trial without preparation." Powell v. State of Alabama, supra, 287 U.S. at 58, 53 S.Ct. at 60, 77 L.Ed. at 165. The long and the short of Smotherman's dilemma is that court-appointed counsel did not investigate, he did not inquire, he did not prepare. Had the insanity defense been thoroughly prepared and advocated with vigor on petitioner's behalf, this court would do well to forego an appraisal of what facts could have been uncovered and presented but were not.

But this was a capital case. Counsel's appearance and advocacy of the insanity defense was pro forma rather than zealous.

At the evidentiary hearing counsel testified that he did not know of the existence of petitioner's confessions and consequently made no pre-trial inspection thereof, that he had no knowledge of his lengthy confinement and that he was unaware that Smotherman had been extensively interrogated by the ranger. He related that Smotherman never told him about these facts.

It would indeed be an anomaly of the Sixth Amendment were this court to hold that what a defendant did or did not relate to his attorney concerning the facts of his case was to be in any manner determinative of the question of that lawyer's effective representation of the defendant. A lawyer attends a professional school for 3 years; he is instructed in a myriad of legal theories, rules and rationales, all of which are designed to achieve but one end: the development of a searching, inquisitive and analytical mind. The layman is not learned in the arts of the legal profession. The defendant in most instances is unaware of rules of law and rules of evidence of which the particular facts of his case may take advantage. It is only through the "guiding hand of counsel," Powell v. State of Alabama, supra, that these facts can be aired and their value determined. The lawyer who does not probe, does not inquire, and does not seek out all the facts relevant to his client's cause is prepared to do little more than stand still at the time of trial.

While this court does not speculate as to why court-appointed counsel did not make the inquiries heretofore mentioned, it is to be observed, and with concern, that he was a neophyte lawyer. Counsel was out of law school less than 11 months when he tried petitioner's case and his actual practice of law, from the date on which he was licensed, had been under way for a lesser period of time. What trial experience he had acquired before petitioner's case is not known, although he testified he had from two to four criminal appointments at that time.

In MacKenna v. Ellis, 5 Cir., 1960, 280 F.2d 592, one of the grounds for the court's determination that the therein petitioner's appointed counsel were inadequate was their lack of trial experience. Judge Wisdom stated, 280 F.2d at 600,

The young men appointed as counsel were licensed lawyers and graduates of good law schools. No doubt, today, they are excellent lawyers. Their lack of vigor in conducting MacKenna's defense and their mistakes did not show up, of course, until *after* their appointment. But a trial judge who appoints fledgling attorneys as defense counsel, over the defendant's protest, cannot wash his hands of their mistakes.[14]

14. MacKenna objected to the appointment of counsel because he had paid an attorney $150 to represent him. When that attorney did not appear in court

Herein MacKenna teaches that competency of counsel is inherently synonymous with the fundamental fairness of the trial itself and it is in this respect that a trial judge is clothed with the duty of assigning effective counsel. Quite obviously the judge is in no position to watch over the shoulder of appointed counsel as he prepares his case. It is necessary that he have some independent knowledge of counsel's capabilities before appointment.

Furthermore, Smotherman's fledgling lawyer was put to trial by the court only one week after his appointment. The manner in which counsel prepared the case is what should be expected as resulting from such short notice. The appointment of an inexperienced attorney to defend this capital case and the allocation to him of one week to prepare for trial substantially infected the fundamental fairness of petitioner's trial.

And certainly, nothing said here is intended to condemn or be critical of the neophyte. Unfortunately, graduation from law school does not endow the young lawyer with all of the skills, abilities and "know-how" of the experienced advocate. It is true, of course, that he must gain experience somewhere, somehow, and sometime, but it is doubtful that the constitutional right to assistance of counsel is fairly met by using the unassisted representation of an indigent defendant as a training method for the neophyte lawyer. One wonders if the legal profession should not take inventory and consider the practice followed by the medical profession in establishing internships for the law school graduates.

 One other consideration merits discussion. "Whether the [habeas cor-

pus] applicant has been denied the benefit of assistance of counsel guaranteed to him by the Fourteenth Amendment depends upon 'the particular circumstances' appearing in the record." Mosley v. Dutton, 5 Cir. 1966, 367 F.2d 913, 916. The appointment of inexperienced counsel to defend a capital case on one week's notice followed by a jury verdict of 99 years; the use of a confession against the defendant obtained after 5 days of in-custody interrogation [15] being one of the strongest items of evidence the state offered; and the inability of the petitioner to appeal his case, are circumstances "sufficient, at least, to shift to the respondent the burden of introducing [the] record and transcript or its reasonable equivalent", Mosley v. Dutton, supra, 367 F.2d at 916, so that this court can observe the action of the court-appointed counsel. The duty of the state court to assign petitioner counsel "is not discharged at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." Powell v. State of Alabama, supra, 287 U.S. at 71, 53 S.Ct. at 65, 77 L.Ed. at 172. The record of petitioner's trial has been destroyed and its equivalent was not presented. The state failed to discharge this burden.

 Disregarding what might have happened, this court concludes (1) petitioner did not waive his right to appeal (2) he was denied the right to counsel concerning his right to appeal, thereby denying him an appeal; (3) he was not afforded reasonably effective assistance of counsel for the reasons that his court-appointed counsel conferred with him briefly only once before trial, counsel

when MacKenna's case was called for trial, the court appointed 2 lawyers to represent him, to which he objected. The fact that MacKenna objected to appointment of these counsel is not deemed the controlling factor in the trial judge's responsibility for their mistakes. The manner in which competency of counsel affects the essential fairness of a trial is not to be judged on whether a defendant interposes an objection to the appointment of counsel. Indeed, as MacKenna indicates, the mistakes of trial

counsel are in most instances not perceptible until after the trial.

15. The evidentiary hearing did not establish with certainty which of petitioner's 3 confessions was introduced in evidence. It appears, however, that the one offered was the last one he gave on the fifth day of interrogation. It was only after obtaining this confession that the ranger felt the young girl's statement had been corroborated.

failed to investigate and inquire into all the facts of the case, counsel failed to adequately prepare for trial, counsel's defense of the case was no more than a pro forma appearance on his part, and counsel failed to advise petitioner of his rights concerning his appeal and failed to apprise him of the merit of errors occurring at the trial, if any, so that appellant could intelligently exercise his right to appeal; and (4) the trial court denied petitioner due process of law in appointing an inexperienced attorney to defend a capital case and in affording such attorney only one week to prepare for trial, although he requested a postponement.[16]

The judgment of conviction is vacated. The state will be given 60 days in which to retry petitioner, if it so desires. In the absence of such a trial within the allotted time, the respondent shall discharge the petitioner.

It is so ordered.

16. In those habeas corpus cases in which the district court determines that the petitioner's right to appeal has been frustrated, the appropriate remedy is a remand to the state courts for appellate review. Where, however, as is here the case, the state court reporter's notes of the trial have been destroyed, a new trial must be granted. Pate v. Holman, 5 Cir. 1965, 341 F.2d 764. Because it is necessary to grant a new trial on this ground, this court has undertaken a determination of petitioner's other claims which would likewise require the granting of such relief.